IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| JOHN ODI | : | |
|---|---|---|
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 15-4903 |
| GARY ALEXANDER, ET AL. | : | |

**MEMORANDUM**

**SURRICK, J.**                                                                 **MAY ⨭2, 2019**

Presently before the Court is Defendants' Motion for Summary Judgment with respect to

the claims asserted in Plaintiff's Second Amended Complaint. (ECF No. 41.) For the following

reasons, Defendants' Motion will be granted.

In this civil rights action pursuant to 42 U.S.C. § 1983, Plaintiff John Odi, individually

and as representative of the estate of his deceased mother, Lily Odi, alleges that Defendants

unlawfully denied Ms. Odi Medicaid benefits, also known as "Medical Assistance" or "MA,"

based upon her race and national origin. Plaintiff alleges that this led to Ms. Odi's death from

metastatic breast cancer. Plaintiff asserts claims against Defendants for violation of Ms. Odi's

equal protection and procedural due process rights and for violation of the Medicaid Act and

associated regulations.[1]

Defendants contend that they are entitled to judgment on Plaintiff's claims because,

based on the undisputed facts and applicable law: (1) there is no evidence that any of the

Defendants were personally involved in any alleged violations of Ms. Odi's rights; and (2) the

---

[1] Title XIX of the Social Security Act, codified at 42 U.S.C. §§ 1396-1396v, is
commonly known as the "Medicaid Act."

denial of Ms. Odi's 2012 application for Medicaid did not violate her statutory or constitutional rights.

In response, Plaintiff argues that Ms. Odi was entitled to Medicaid under the statutory and regulatory provisions applicable to non-citizens, and that Defendants were involved in alleged discriminatory eligibility determinations with respect to Ms. Odi. Based on a detailed review of the record, and although Plaintiff has identified immaterial factual ambiguities and potential negligence by non-parties, there is simply no evidentiary basis to support a finding that any of the Defendants were personally involved in any deprivation of Ms. Odi's rights, or a finding that the Medicaid determinations applied to her in fact violated her constitutional or statutory rights.[2] The fact that Ms. Odi and the Odi family had to deal with metastatic breast cancer is indeed unfortunate. However, the sympathetic nature of this situation does not provide a legal basis to hold Defendants liable for Plaintiff's claims.

## I. BACKGROUND

### A. Factual Background

#### 1. The Parties and DHS Personnel

Lily Odi immigrated to the United States from Nigeria in May 2008 at the age of 70. (Odi Dep. 22-24, Defs.' SJ Ex. D, ECF No. 41-4.)[3] Ms. Odi initially came to the United States on a visa to live with her son, Plaintiff John Odi, and his wife and children in Delaware County,

---

[2] Defendants have alternatively argued that, even if any genuine issues existed for trial, they would be entitled to qualified immunity as to Plaintiff's claims. Because we conclude that the record cannot sustain a finding that any of the Defendants were personally involved in the alleged violations of Ms. Odi's rights, or a finding that any such violations in fact occurred, we need not address the issue of qualified immunity.

[3] The transcript of John Odi's deposition, with exhibits, is also attached to Plaintiff's Summary Judgment Opposition as Exhibit A. (ECF No. 43-1.)

Pennsylvania. (*Id.* at 23-24, 27-28.) Ms. Odi subsequently applied for, and was granted, Lawful Permanent Resident ("LPR") status in the United States and was issued a Permanent Resident Card, also known as a "Green Card," effective April 9, 2010.[4] (*Id.* at 28-30; *see also* L. Odi Green Card, Pl.'s Opp. Ex. B, ECF No. 43-2.)

Defendants Gary Alexander and Beverly Mackereth are both former Secretaries of Pennsylvania's Department of Human Services ("DHS"), the state agency responsible for administering Medical Assistance, also known as Medicaid, in Pennsylvania.[5] (Second Amended Complaint ("SAC") ¶ 9, ECF No. 24; Defs.' SJ Br. 2, ECF No. 41.) Alexander was DHS Secretary from February 2011 to February 2013. (SAC ¶ 9.) Mackereth succeeded Alexander and served as DHS Secretary from February 2013 to January 2015. (*Id.* ¶ 12.) Defendant Linda Robson is the Executive Director of the DHS County Assistance Office for Delaware County ("DCAO"), and Defendant Jane Richards, now retired, was the District Administrator of the DCAO office in Darby, Pennsylvania, during the time period relevant to this action.[6] (Robson Dep. 26, 29-30, Pl.'s Opp. Ex. K, ECF No. 43-11.) During the relevant period, Robson was Richards' direct supervisor. (*Id.* at 29-30; *see also* Richards Dep. 12, Defs.' SJ Ex. C, ECF No. 41-3.) Richards, in turn, supervised the Darby DCAO Managers

---

[4] Persons with LPR status are not U.S. citizens but are allowed to live and work permanently in the United States. *See* U.S. Citizenship & Immigr. Servs., *Green Card*, https://www.uscis.gov/greencard (last visited Apr. 17, 2019); *see also* U.S. Citizenship & Immigr. Servs., *Glossary*, https://www.uscis.gov/tools/glossary (last visited Apr. 17, 2019) (defining "lawful permanent resident").

[5] DHS was formerly named the Department of Public Welfare ("DPW"). *See* Act of September 24, 2014, P.L. 2458, as amended, 62 P.S. § 103 (effective November 24, 2014) (changing agency name from DPW to DHS). We refer to the state agency as DHS throughout this Memorandum.

[6] The DCAO also has a district office in Chester, Pennsylvania. (Robson Dep. 16-17.)

("Managers"), Caroline Hardy and Andrea Clark. (Richards Dep. 12-13.) The Managers supervised several income maintenance casework supervisors ("Supervisors"), including, among others, Thomas Sanders and a Mr. Gibson. (Robson Dep. 164; Richards Dep. 31-32; Sanders Dep. 7-8, Defs. SJ Ex. B, ECF No. 41-2.)

Sanders and others in his position supervised the DCAO's income maintenance caseworkers ("Caseworkers"). The Caseworkers were responsible for the day-to-day handling of applications for Medicaid and other DHS benefit programs.[7] (Sanders Dep. 11-12, 17.) The Supervisors did not review all of a Caseworker's files or records but did random monthly reviews. (Robson Dep. 35.) Caseworkers issued determinations as to an applicant's eligibility for Medicaid with the aid of the DHS Medical Assistance Eligibility Handbook, other DHS policy and procedure publications, and a computer system that applied the statutory and regulatory eligibility criteria to the applicant information in the DHS system. (Robson Dep. 34-35, 44, 111; Sanders Dep. 17-20; Concepcion Dep. 34-35, 69-70, Pl.'s Opp. Ex. G, ECF No. 43-7.) During the relevant time period, Caseworkers and other DHS personnel involved with benefit applications entered and maintained narratives and information about applicants' cases in a computer software system known as eCIS. (Concepcion Dep. 40-42.) The Darby DCAO Caseworkers involved with Ms. Odi's Medicaid applications included Latifah K. Sabreen, Maria Concepcion, and Brenda Johnson. (Robson Dep. 138, 145, 147, 164, 176, 194.)

---

[7] The Darby DCAO also had clerks who received application materials submitted in person and were responsible for date-stamping the materials, entering the materials into the application processing system, and assigning applications to Caseworkers. (Robson Dep. 18-20, 37-40.) Application materials could also be submitted online through a system called Compass. (*Id.* at 18-20.) The clerks were supervised by an administrative officer. (*Id.* at 36-37.)

4

### 2. *Lily Odi's Medicaid Applications*

#### (a) 2009 Application

In mid-September 2009, Ms. Odi experienced stomach pain, and Plaintiff took her to the emergency room at Delaware County Memorial Hospital ("DCMH"), where she was diagnosed with pancreatitis. (Odi Dep. 39-40; 2009 Appl., DHS DEFS 000132, Defs.' SJ Ex. F, ECF No. 41-6.) DCMH successfully treated Ms. Odi's pancreatitis with laser surgery. (Odi Dep. 44, 47-48.) At the request of DCMH, Plaintiff submitted an application for Medicaid to the DCAO on his mother's behalf. (*Id.* at 47.) Since Ms. Odi did not yet have LPR status, the Application correctly identified her citizenship status as "5. Other – Not Eligible for Benefits Except for Emergency Medical Benefits."[8] (Odi Dep. 62-64; *see* also 2009 Appl., DHS DEFS 000135.)

It is undisputed that DHS granted Ms. Odi's 2009 Application for Medical Assistance for the treatment of her pancreatitis as an emergency medical condition. (eCIS Narratives, DHS DEFS 0293, Defs' SJ Ex. G, ECF No. 41-7 (stating "PH auth for 9/13/09-9/28/09 only due to client's citizenship status. client verf. emergency letter from hosp. client also verf. residence, and management. Notices sent"); *see also* Odi Dep. 70-71 (stating he had no reason to believe the 2009 Application was not granted).) DHS records indicate that DCAO Caseworker Sabreen was assigned to Ms. Odi's file at the time her 2009 Application was approved. (eCIS Narratives, DHS DEFS 0293; *see also* Robson Dep. 175-76.) The charges for Ms. Odi's pancreatitis

---

[8] In September 2009, Ms. Odi did not fall under any of the other four categories of citizenship status listed on the Medicaid application form: "1. U.S. Citizen; 2. Perm. Alien (Qualified Alien or PRUCOL); 3. Temp. Alien; 4. Refugee/Asylee/Parolee." (2009 Appl., DHS DEFS 000135.)

5

treatment at DCMH totaled $238,695 and were covered by Medicaid. No one sought payment from Plaintiff or his mother for any charges related to Ms. Odi's treatment for pancreatitis. (2009 Appl., DHS DEFS 000142; Odi Dep. 59-60, 65, 69.) After Ms. Odi's pancreatitis was treated, through approximately May 2011, Plaintiff obtained primary medical care for his mother at a clinic on a fee-for-service basis and did not seek Medical Assistance for that care. (Odi Dep. 75.)

(b)     2011 Application

In approximately May 2011, Ms. Odi complained about "something going on around her breast," and her primary care physician referred her to Springfield Hospital, which offered free breast screening for uninsured women over 40. (*Id.* at 76-77.) After having a mammogram, Ms. Odi was diagnosed with breast cancer. (*Id.* at 77-79.) She was then referred to DCMH, where the physician who performed Ms. Odi's biopsy told Plaintiff that his mother's cancer was at the "middle stage" and would require a mastectomy followed by chemotherapy and radiation. (*Id.* at 80-83.) The surgeon advised Plaintiff that they needed to apply for Medical Assistance for his mother before the hospital could perform a mastectomy. (*Id.* at 81-82, 84.)

Plaintiff applied for Medicaid on his mother's behalf and included with the application information about Ms. Odi's nationality, ethnicity, and citizenship status. (*Id.* at 83-85, 99-100.) On or about June 23, 2011, DHS approved Ms. Odi for emergency Medical Assistance for her initial breast cancer treatment. (eCIS Narrative 6/23/2011, DHS DEFS 0292; *see also* Odi Dep. 84-88.) DHS records regarding the approval state:

Approval given for [Medical Assistance] for [L]ily Odi for emergency medical assistance for undocumented alien. Ms. Odi has been diagnosed with breast cancer and needs further treatment. Without treatment her condition could be fatal.

6

Approval given to 12/31/11. Renewal to be done then with an update of her medical condition and further management review.[9]

(eCIS Narrative 6/23/2011, DHS DEFS 0292.) It is undisputed that Ms. Odi received Medical Assistance for her cancer treatment—including for the mastectomy, chemotherapy, and radiation—for 12 months, from approximately June 2011 through approximately May or June 2012. (eCIS Narrative 6/27/2011, DHS DEFS 0292; Odi Dep. 94-98, 106-110.) DHS informed Plaintiff that in order for his mother to receive Medical Assistance beyond the 12-month period, they were required to reapply for or seek renewal of her benefits before the expiration of that period. (Odi Dep. 97-98, 106, 112-115.)

DHS records reflect that Ms. Odi did not submit the renewal packet for her Medical Assistance by the date that it was due, May 14, 2012. The eCIS Narrative dated May 16, 2012, entered by Caseworker Sabreen, states: "Client failed to return renewal packet by 5/14/12. [C]ase closed 042. Notices sent[.]" (eCIS Narrative 5/16/2012, DHS DEFS 0292.) The parties dispute whether DHS provided Ms. Odi with a renewal form or other application prior to the expiration of her emergency medical condition benefits. Plaintiff contends that DHS "did not provide Ms. Odi with a renewal form or other application at that time." (Pl.'s Opp. 2.) However, the eCIS Narrative dated April 18, 2012, entered by Caseworker Sabreen before Ms. Odi's benefits expired, states: "Packet Processed on 4/18/2012 with Mail-in Interview type." (eCIS Narrative 4/18/2012, DHS DEFS 0292.) According to Robson, this entry indicates that Ms. Odi "needed to have a renewal done and [DCAO] sent the packet out." (Robson Dep. 182.) The Narrative dated June 7, 2012, states that Ms. Odi "called the [DHS Customer Service Center] to report her renewal forms will be late," that "she was out of town when the renewal

_____

[9] This Narrative does not identify the DHS employee who entered it, and the record does not indicate why Ms. Odi was listed as an "undocumented alien" as of June 23, 2011, when she had LPR status at that time.

7

was due," and "that she will submit renewal forms ASAP." (eCIS Narrative 6/7/2012, DHS DEFS 0292.) Plaintiff disputes that his mother called DHS to report that her renewal forms would be late because she was out of town when they were due. According to Plaintiff, his mother had not traveled anywhere at that time. (Odi Dep. 170-72.) Regardless of this dispute, there is no evidence in the record that Plaintiff or Ms. Odi submitted an application to renew or maintain her Medical Assistance before her emergency medical benefits expired. To the contrary, Plaintiff acknowledged that although his mother was still undergoing treatment and responding well to it, he did not apply to renew or reinstate her Medical Assistance until after her 12 months of benefits had expired. (Odi Dep. 97-99, 106-10, 114-15.)

(c)    2012 Application

In June or July 2012, Plaintiff applied on behalf of his mother to reinstate her Medicaid benefits. (Odi Dep. 106.) On July 5, 2012, DHS notified Ms. Odi that it had received her request for Medicaid benefits and that, "starting July 3, 2012," she did not qualify "because [she] did not give us the information we asked for" that was "due by 5/14/12." (Notice No. 9008085255, L. Odi File, DHS DEFS 0001-0002.)[10] On July 27, 2012, DHS issued another notice to Ms. Odi requesting additional information about her application, including, a "Doctor's statement," described as a "letter from doctor stating this is a life threatening emergency."[11] (Notice No. 9008395350, L. Odi File, DHS DEFS 0004-0006.)

---

[10] DHS documents identified as the Lily Odi File are attached to the Robson Deposition as "Robson-2" and are Bates-numbered DHS DEFS 0001-0130.

[11] The corresponding eCIS Narrative for July 27, 2012, described the information DHS needed in support of Ms. Odi's application, including, "emergency forms completed by Dr. stating this is life threatening and client is currently in treatment." (eCIS Narrative 7/27/2012, DHS DEFS 0291.)

8

On August 21, 2012, DHS notified Ms. Odi that she "did not qualify for Medical

Assistance because of citizenship requirements." (Notice No. 9008752725, L. Odi File, DHS

DEFS 0007-0008.) The corresponding eCIS Narratives, dated August 20, 2012, stated:

- MA APP RECEIVED THROUGH COMPASS FOR [LILY] ODI AGE 74. CLEINT IS AN PERM RES ALIEN AND DOES NOT MEET THE 5 YEAR BAR. APP GIVEN TO MANAGEMENT FOR EMER MED AUTHORIZATION AND AUTHORIZATION WAS DENIED. NOTICE(S) GNERATED. T/C TO CLEINT CALL BARB MONLEY FROM DEL CO.

- Application received for MA on an emergency basis for [Lily] Odi. She is a permanent alien under the 5 yr ban. The documentation provided does not support the emergency nature of her medical condition and meet the criteria in MAH 322.34.[12]

(eCIS Narratives 8/20/2012, DHS DEFS 0291.) The record contains no evidence that any of the

Defendants had contemporaneous knowledge of or any involvement in the determination that

Ms. Odi did not qualify at that time for emergency medical condition benefits.

DHS issued a notice to Ms. Odi, dated August 21, 2012, stating that she did not qualify

for benefits "because you are not a United States citizen or an alien lawfully admitted for

permanent residence," and that the benefits denial was based on 55 Pa. Code § 149.23.[13] (Notice

No. 9008752725, L. Odi File, DHS DEFS 0008.) The incorrect statement that Ms. Odi did not

have LPR status and the citation to a Pennsylvania regulation as the basis for the denial were

apparently erroneously included as part of the computer-generated notice that is issued "for the

---

[12] MAH 322.34 refers to the DHS Medical Assistance Eligibility Handbook ("MAH") provision that states, in relevant part: "Qualified non-citizens, subject to the five year bar, . . . may receive federally funded [Medical Assistance] to cover an emergency medical condition if the non-citizen meets the income, resources and category requirements of the [Medical Assistance] program, *otherwise known as Emergency Medical Assistance (EMA)*." (MAH, Defs.' SJ Ex. Q, ECF No. 41-17 (emphasis in original).)

[13] The Pennsylvania Code provision cited in the Notice states that "[a] person who is not a citizen of the United States is not eligible for [Aid to Families with Defendant Children] unless he is an alien lawfully admitted for permanent residence or otherwise permanently residing in the United States under provisions of law." 55 Pa. Code § 149.23.

9

clients not eligible for that benefit because of citizenship." (Robson Dep. 101-02.) However, as reflected in the above-quoted eCIS Narratives, the denial of emergency Medical Assistance to Ms. Odi was based on provisions of federal law, discussed *infra.* (*Id.* at 102-03.)

On or about September 19, 2012, Plaintiff appealed the August 2012 denial of emergency Medical Assistance to DHS's Bureau of Hearings and Appeals ("BHA"). (Odi Dep. 121; eCIS Narrative 9/19/2012, DHS DEFS 0291; BHA Cover Sheet, DHS DEFS 0062-0064, Defs.' SJ Ex. I, ECF No. 41-9.) DHS records reflect that Caseworker Concepcion and Supervisor Sanders were assigned to Ms. Odi's 2012 Application at the time of the appeal. (BHA Cover Sheet, DHA DEFS 0062-0064; Richards Dep. 30-31.) In support of this appeal, Plaintiff provided DHS with a letter dated August 28, 2012—after the denial decision had been issued—from his mother's oncology physician, Dr. Jenab-Wolcott. (Jenab-Wolcott Ltr., Defs.' SJ Ex. J, ECF No. 41-10.) That letter described Ms. Odi's cancer as stage III-C adenocarcinoma and stated that she was undergoing adjuvant chest wall radiation which would be completed in September 2012, that she was on Femara, and that she was "tolerating it relatively well with mild hot flashes and minimal joint pain." (*Id.*) The letter further stated that Ms. Odi would need five years of hormonal therapy, annual follow-up mammograms beginning six months after completion of radiation, and that it was "imperative that [she] continue to have access to medical treatment, follow up and prescriptions for her breast cancer." (*Id.*) In addition, an August 30, 2012 Clinical Visit Summary from one of Ms. Odi's medical providers, apparently submitted in connection with her appeal, listed the medical conditions Ms. Odi was experiencing at that time, including breast cancer, but did not indicate that any were of an acute or emergent nature. (Clinicial Visit Summary, Defs.' SJ Ex. K, ECF No. 41-11; L. Odi File DHS DEFS 0071.)

10

There is no evidence in the record that Ms. Odi's Caseworker at the time, any DCAO

Supervisor or Manager, or any of the Defendants, received the letter from Dr. Jenab-Wolcott or

the Clinical Visit Summary before the August 21, 2012 denial. In addition, uncontroverted

evidence reflects that, in general, decisions regarding whether the information submitted by an

applicant demonstrated a qualifying emergency medical condition were not made by DCAO

personnel but were referred to a DHS medical review team in Harrisburg, Pennsylvania.

(Robson Dep. 216-17 (stating that the DCAO refers most medical emergency condition

eligibility determinations to the DHS medical review team); *see also* Richards Dep. 44-45

(stating that, "[i]n a case [involving emergency medical condition eligibility] that wasn't already

stated in policy that it could be approved, we sent it to Harrisburg, because there's no one in our

office that had medical knowledge").)

On or about October 15, 2012, Plaintiff or Ms. Odi requested a pre-hearing telephone

conference in connection with the 2012 appeal. (eCIS Narrative 10/15/2012, DHS DEFS 0290

(stating "Received Pre-Hearing Conference Notice. Client can be contacted on cell at . . . or

home at. . . . Notice given to Supervisor." (phone numbers omitted)).) Testimony in the

summary judgment record indicates that it was Supervisor Sanders' responsibility to respond to

Ms. Odi's October 15, 2012, request for a pre-hearing conference. For purposes of this Motion,

we assume that he did not respond contemporaneously to Ms. Odi's initial request for a pre-

hearing conference. (Richards Dep. 52-57; Concepcion Dep. 53-55, 74-75.) The eCIS

Narratives reflect that on or about March 14, 2013, Ms. Odi called the DHS Customer Service

Center and stated that she "never received a phone call re appeal. [P]er narratives, pre-hearing

conference notice received. [C]lient requests return call from [Caseworker] to discuss appeal."

(eCIS Narrative 3/14/2013, DHS DEFS 0290.) This Narrative reflects that Ms. Odi provided

phone numbers where she could be reached, that the DHS representative provided Ms. Odi a "ticket" number for the call, and that Ms. Odi's inquiry was forwarded to the DCAO "for a return call." (*Id.*) The eCIS Narratives reflect that, the same day, an unidentified DHS or DCAO representative "called client, explained to client that worker will research situation as i[t] occurred in [A]ugust 2012 and will call client back. [C]lient NOT compliant. [C]leared ticket."[14] (eCIS Narrative 3/14/2013, DHS DEFS 0290.)

A pre-hearing conference was held on April 23, 2013, and DHS approved Ms. Odi for limited Medical Assistance benefits in a state-funded category retroactive to August 1, 2012. (eCIS Narrative 4/23/2013, DHS DEFS 0290; Odi Dep. 121-22.) As a result of that conference, Ms. Odi withdrew her appeal. (eCIS Narrative 4/23/2013, DHS DEFS 0290; L. Odi Appeal Withdrawal, Defs.' SJ Ex. L, ECF No. 41-12.) There is no evidence in the record that any of the Defendants had contemporaneous knowledge of or involvement in Ms. Odi's 2012 Application for Medical Assistance or her related appeal.

On April 24, 2013, DHS sent Ms. Odi a Notice of her retroactive approval for state-funded benefits. (Notice No. 9105488931, Defs.' SJ Ex. M, ECF No. 41-13.) The Notice advised Ms. Odi, *inter alia*:

> You qualify for Medical Assistance in a state-funded category. You were reviewed for limited categories of Medical Assistance. This is because you have not been in a permanent resident status or qualified alien status in the United States for five years or more. After five years, you may qualify for other Medical Assistance categories that may cover additional medical services. . . .

(*Id.*) Significantly, and although DHS approved Ms. Odi for limited Medical Assistance benefits in a state-funded category, there is no evidence in the record to contradict DHS's determination

---

[14] Robson testified that the eCIS Narrative reference to "client NOT compliant" likely indicated "that the client did not comply with something we asked them to provide." (Robson Dep. 190.)

that in 2012 and 2013, Ms. Odi was subject to the five-year bar and was ineligible for federal Medicaid benefits except to treat an emergency medical condition as defined under federal law.

The record is unclear regarding whether or to what extent Ms. Odi sought or received medical care covered by Medicaid during the period between the expiration of her initial emergency Medical Assistance benefits for breast cancer and the April 2013 retroactive approval of limited state-funded Medical Assistance benefits. Plaintiff testified that during this period, DCMH denied Ms. Odi treatment and told him that her "insurance [was] no longer active," and that between July or August 2012 and May or June 2013, Ms. Odi did not receive medical care for her cancer that was paid for by Medicaid "in real time." (Odi Dep. 98-99, 176.) Plaintiff also claimed that, even after his mother was approved for retroactive state-funded Medical Assistance in April 2013, the Medical Assistance identification card and insurance card that she had been issued were not activated or accepted by providers from whom Ms. Odi sought treatment. (Odi Dep. 126-27.) However, Plaintiff also testified that neither he nor his mother's estate had to pay for any medical care rendered to Ms. Odi between 2012 and the date of her death. (Odi Dep. 149-50.) Moreover, DHS records, supported by affidavit, reflect that on various dates in May 2013, after the April 23, 2013, pre-hearing conference, Ms. Odi received cancer-related treatment and diagnostic procedures, paid for by DHS, from other doctors in the same oncology practice as her physician, Dr. Dr. Jenab-Wolcott, and from providers at DCMH, Thomas Jefferson University Hospital, Jefferson University Physicians, and Delco Radiologic Associates. (East Decl., ECF No. 45-1.) Finally, there is no evidence in the record that between June/July of 2012 and April/May 2013, Ms. Odi was experiencing an "emergency medical condition," as that term is defined in the applicable statute, regulations, and interpretive caselaw, discussed, *infra*.

### (d) 2013 Application

In June 2013, Ms. Odi traveled to Nigeria and returned to a family home there. (Odi Dep. 153-54.) On September 3, 2013, while Ms. Odi was in Nigeria, DHS denied the renewal of her state-funded Medical Assistance, which had expired in August 2013 after Ms. Odi failed to provide information needed to determine if she qualified—specifically, an application and a medical form. (Notice No. 9018122563, Defs.' SJ Ex. N, ECF No. 41-14; *see also* Robson Dep. 127-128.) Plaintiff timely appealed this denial on behalf of Ms. Odi. (eCIS Narrative 9/27/2013, DHS DEFS 0290.) The record indicates that Caseworker Johnson and Supervisor Gibson were assigned to Ms. Odi's file at the time of the 2013 appeal. (Robson Dep. 164; BHA Cover Sheet, L. Odi File, DHS DEFS 0087-0088.)

In approximately mid-November 2013, while Ms. Odi was still in Nigeria, she contracted malaria. (Odi Dep. 154-55.) Ms. Odi was admitted to Presbyterian Joint Hospital in Nigeria with a diagnosis of "malaria in a known diabetic and hypertensive with right breast cancer associated with distant metastasis." (L. Odi Death Records, Defs.' SJ Ex. O, ECF No. 41-15.) Ms. Odi passed away in that hospital on December 2, 2013, at the age of 75. (*Id.*) Hospital records listed her cause of death as "strongly linked to metastasis from cancer of the right breast." (*Id.*)

Plaintiff continued to appeal the 2013 non-renewal of Ms. Odi's Medical Assistance after her death. (eCIS Narrative 7/1/2014, DHS DEFS 0290.) However, there is no evidence in the record that Ms. Odi or Plaintiff submitted the application and medical information that was requested in the September 3, 2013 denial notice. On May 27, 2015, Plaintiff and DHS entered into a Settlement Agreement regarding this appeal, in which Plaintiff agreed that no unpaid

14

medical bills existed for the time period at issue in the appeal—August 18, 2013 to December 13, 2013. (Settlement Agreement, Defs.' SJ Ex. P, ECF No. 41-16.)

## B. Procedural History

On August 31, 2015, Plaintiff filed his initial Complaint against Defendants Alexander, Mackareth, Robson, and Richards. (ECF No. 1.) Plaintiff filed an Amended Complaint on December 28, 2015. (ECF No. 4.) The Amended Complaint asserted claims of discriminatory denial of benefits in violation of: Title VI of the 1964 Civil Rights Act, 42 U.S.C. § 2000d (Count I); 42 U.S.C. §§ 1983 and 1988 (Count II); 42 U.S.C. § 1981 (Count III); and Section 1396(a)(8) of the Medicaid Act and associated regulation, 42 U.S.C. § 1396a(a)(8) and 42 C.F.R. § 435.930(b) (Count IV). All four counts were asserted against all Defendants, in both their individual and official capacities.

Defendants filed motions to dismiss the Amended Complaint asserting, *inter alia*, lack of subject matter jurisdiction and/or failure to state a claim. (ECF Nos. 5, 12, 17.) Plaintiff filed responses in opposition to Defendants' motions to dismiss. (ECF Nos. 7, 13, 18.) Richards also filed a reply in support of her separate motion to dismiss. (ECF No. 19.) On March 7, 2017, we granted in part and denied in part Defendants' motions to dismiss. *Odi v. Alexander* ("*Odi I*"), No. 15-4903, 2017 WL 914818 (E.D. Pa. Mar. 7, 2017).

On May 1, 2017, Plaintiff filed the SAC, alleging Section 1983 claims against all Defendants, in their individual capacities, for denial of equal protection and procedural due process (SAC Count I), and for violation of Section 1396(a)(8) of the Medicaid Act, 42 U.S.C. § 1396(a)(8), and the associated regulation, 42 C.F.R. § 435.930(b) (SAC Count II).[15]

---

[15] As we noted in *Odi I*, Plaintiff's claim alleging violation of the Medicaid Act and the associated regulation may only be maintained through Section 1983, as the "Medicaid Act generally does not provide a private cause of action." *Odi I*, 2017 WL 914818, at *10 (citing *Sabree v. Richman*, 367 F.3d 180, 182)(3d Cir. 2004)).

Defendants filed a motion to dismiss the SAC pursuant to Rule 12(b)(6), and Plaintiff filed an opposition to that motion. (ECF Nos. 25, 26.) On February 27, 2018, we denied Defendants' motion to dismiss. *See Odi v. Alexander ("Odi II")*, No. 15-4903, 2018 WL 1071928 (E.D. Pa. Feb. 27, 2018). In so ruling, we concluded that at the pleading stage, and accepting as true all of the SAC's well-pleaded facts, Plaintiff had plausibly alleged his Section 1983 claims for relief.[16]

*Id.*

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A dispute is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party. *See Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ). "[A] factual dispute is material only if it might affect the outcome of the suit under governing law." *Id.*

Where the nonmoving party bears the burden of proof at trial, the moving party may identify an absence of a genuine issue of material fact by showing the court that there is no evidence in the record supporting the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *UPMC Health Sys. v. Metro. Life Ins. Co.*, 391 F.3d 497, 502 (3d Cir.

---

[16] In opposition to Defendants' Motion, Plaintiff argues that we previously held, in *Odi II*, that "[i]t is undisputed that Ms. Odi was deprived of benefits under Medicaid." (Pl.'s SJ Opp. 15 (citing *Odi II*, 2018 WL 1071928, at *6).) This argument erroneously equates the standard of review that we applied in *Odi II* at the motion to dismiss stage to the standard that we apply now, where we have a full summary judgment record upon which to evaluate the viability of Plaintiff's claims. Contrary to Plaintiff's argument, we did not conclusively determine in *Odi II* that Plaintiff had established his Section 1983 claims. Rather, we determined that, "[a]ccepting as true all of the SAC's well-pleaded facts, . . . Plaintiff's pleadings [were] sufficient . . . to show that he [had] a plausible claim for relief. *Odi II*, 2018 WL 1071928, at *4 (citation omitted).

16

2004). If the moving party carries this initial burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(c) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ."); *see also Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (noting that nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts" (citation omitted)). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

When deciding a motion for summary judgment, the court must view the facts and inferences in the light most favorable to the nonmoving party, and must not resolve factual disputes or make credibility determinations. *See Big Apple BMW, Inc. v. BMW of North Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied*, 507 U.S. 912 (1993). However, "unsupported assertions, conclusory allegations, or mere suspicions" are insufficient to overcome a motion for summary judgment. *Schaar v. Lehigh Valley Health Servs., Inc.*, 732 F. Supp. 2d 490, 493 (E.D. Pa. 2010) (citing *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir. 1989)). "[A] mere 'scintilla of evidence' in the nonmovant's favor does not create a genuine issue of fact and the non-movant may not rest on speculation and conjecture in opposing a motion for summary judgment." *Ramara, Inc. v. Westfield Ins. Co.*, 814 F.3d 660, 666 (3d Cir. 2016) (internal quotation marks and citations omitted). Courts must not resolve factual disputes or make credibility determinations. *Siegel v. Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1127 (3d Cir. 1995).

## III.   DISCUSSION

The threshold issue before the Court concerns whether there is an evidentiary basis upon which a reasonable jury could conclude that any of the named Defendants were personally involved in the alleged conduct that forms the basis of Plaintiff's claims. We conclude that there is not. This conclusion is case dispositive. However, the parties' submissions also address at some length the issues related to whether DHS's handling of Ms. Odi's Medicaid claims violated her statutory or constitutional rights. We will therefore address those issues as well.

### A.   Requirement of Personal Involvement in Alleged Violations

As noted above, Plaintiff's claims for alleged violation of Ms. Odi's equal protection and due process rights and her rights under the Medicaid Act and associated regulations are founded on Section 1983. It is well established that an individual defendant may not be subject to liability under Section 1983 unless that individual played an affirmative part in the alleged wrongdoing. *See Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005) (citing *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1998)).

As the Third Circuit recently noted, "the tenet that a defendant's § 1983 liability must be predicated on [defendant's] direct and personal involvement in the alleged violation has deep historical roots in tort law principles . . . and is reinforced by persuasive authority from our Sister Circuits." *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 289 (3d Cir. 2018). The Court in *Jutrowski* further explained:

In the § 1983 context, these principles have led the Supreme Court to require a "showing of direct responsibility" by the named defendant and to eschew any "theory of liability" in which defendants played "no affirmative part in depriving any[one] . . . of any constitutional rights," *Rizzo v. Goode*, 423 U.S. 362, 376-77 . . . . (1976)—including theories of vicarious or respondeat superior liability, *see Ashcroft v. Iqbal*, 556 U.S. 662, 676 . . . (2009) . . . .

18

*Id.* at 290 (alterations in original); *see also Evancho*, 423 F.3d at 353 ("[L]iability [under § 1983] cannot be predicated solely on the operation of respondeat superior." (citation omitted)).

Although supervisors may be held liable for the acts of a subordinate under limited circumstances, such liability can only be established by showing: (1) a supervisor's "personal direction or . . . actual knowledge [of] and acquiescence" in the wrongdoing, or (2) that "a supervisor tolerated past or ongoing misbehavior." *Argueta v. U.S. Immigration & Customs Enf't*, 643 F.3d 60, 72 (3d Cir. 2011) (citation and internal quotation marks omitted); *see also Jankowski v. Lellock*, 649 F. App'x 184, 188 (3d Cir. 2016) (affirming dismissal of claims against school police officer and principal where facts alleged did not support inference that defendants "knew about and acquiesced in" subordinate's conduct); *Anderson v. City of Phila.*, No. 16-5717, 2017 WL 550587, at *4 (E.D. Pa. Feb. 10, 2017) (noting that, to show acquiescence, "the supervisor must contemporaneously know of the violation of a plaintiff's rights and fail to take action." (citing *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1294 (3d Cir. 1997))). Moreover, a supervisor's participation in after-the-fact review of alleged wrongdoing, or failure to take action to prevent repetition of misconduct, is insufficient to establish personal involvement. *See, e.g., Rode*, 845 F.2d at 1208; *Chinchello v. Fenton*, 805 F.2d 126, 133 (3d Cir. 1986).

In this case, the summary judgment record is clear that the determinations concerning Ms. Odi's eligibility for Medical Assistance were made by the Caseworkers, apparently with direction from the DHS medical review team in Harrisburg regarding whether Ms. Odi had a qualifying emergency medical condition. The role of the Caseworkers' immediate Supervisors, Sanders and Gibson, was limited to random file reviews and participation at the pre-hearing conference or appeal stages. The record contains no evidence that DHS Secretaries Alexander

19

and Makereth, DCAO Executive Director Robson, or Darby DCAO District Administrator Richards directly supervised the Caseworkers or Supervisors or had any involvement in or contemporaneous knowledge of any of the eligibility determinations regarding Ms. Odi's Medical Assistance applications and appeals.

Indeed, Richards testified that if issues arose regarding a Caseworker's determination as to Ms. Odi's eligibility for Medicaid in 2012, those issues would first be raised with the Supervisor and, if necessary, a Manager, and "the expectation wasn't for [Richards] to get involved directly." (Richards Dep. 40-43.) Robson, as DCAO Executive Director, was even further removed from day-to day eligibility decisions, as her responsibilities encompassed the "overall running of the [DCAO], hiring, discipline, making sure the work gets done." (Robson Dep. 15-16.) Although Robson reviewed Ms. Odi's file in connection with this litigation, her uncontroverted deposition testimony demonstrates that she had no contemporaneous knowledge of or involvement in the handling of Ms. Odi's case. *(See id.* at 69-70, 83-84.) Plaintiff presents nothing to the contrary. With regard to Secretaries Alexander or Makereth, the record is devoid of any evidence suggesting that they had any personal knowledge of or involvement in this matter. In fact, at his deposition Plaintiff testified that he did not know who any of the Defendants were or why they were named as Defendants in this case. (Odi Dep. 105.)

Finally, there is no evidence of any past instances of case mishandling, discrimination, or other misconduct by any of the DHS/DCAO personnel who were involved in Ms. Odi's applications. Therefore, there is no basis for an inference that any of the Defendants knew of or tolerated past or ongoing violations of applicants' rights. Because no factual basis exists to establish the personal involvement of any of the Defendants in the alleged violations of Ms. Odi's rights, all of the Defendants are entitled to summary judgment.

## B. Alleged Violation of Medicaid Act and Regulations

Plaintiff alleges that Defendants violated Ms. Odi's rights under 42 U.S.C. §1396a(8) and 42 C.F.R. §435.930(b). These provisions mandate that Medical Assistance be afforded to qualified individuals with "reasonable promptness," until such individuals "are found to be ineligible." 42 U.S.C. § 1396a(8); 42 C.F.R. § 435.930(b). In order to assess these claims, it is necessary to outline the statutory and regulatory framework applicable to the Medical Assistance determinations in this case.

The Medicaid Act established a combined federal-state funding program for the purpose of providing medical assistance to eligible low-income persons. *Sabree ex rel. Sabree v. Richman*, 367 F.3d 180, 182 (3d Cir. 2004). Although states are not required to participate in the Medicaid program, those that do and accept federal funding must comply with the Medicaid Act and the corresponding regulations. *Id.* To participate in Medicaid, "'states must abide by federal statutory law governing Medicaid reimbursement or risk losing Medicaid reimbursement from the federal government for that payment.'" *Spring Creek Mgmt., L.P. v. Dep't of Pub. Welfare*, 45 A.3d 474, 477 (Pa. Commw. Ct. 2012) (quoting *Arellano v. Dep't of Human Servs.*, 943 N.E. 2d 631, 636 (Ill. App. Ct. 2010)).

In order to qualify for Medicaid benefits, and subject to the emergency medical condition exception discussed below, a non-citizen must satisfy two statutory requirements. First, the non-citizen must be a "qualified alien" as defined in Section 1641 of the Professional Responsibility and Work Opportunity Act of 1996 ("PRWORA"), 8 U.S.C. § 1611(a). Qualified aliens include, among others, persons with LPR status, aliens who have been granted asylum, and refugees. 8 U.S.C. § 1641(b)-(c). Second, to be generally eligible for Medicaid benefits, the non-citizen must have been a qualified alien for at least five years. 8 U.S.C. § 1613(a). This second

21

requirement is known as the "five-year bar." The five-year bar, as detailed by the PRWORA, states as follows:

[A]n alien who is a qualified alien . . . and who enters the United States on or after August 22, 1996, is not eligible for any Federal means-tested public benefit for a period of 5 years beginning on the date of the alien's entry into the United States with a status within the meaning of the term "qualified alien."

8 U.S.C. § 1613(a). Pursuant to federal regulations, Medicaid is a "Federal means-tested public benefit." *See* HHS, "Interpretation of 'Federal Means-Tested Public Benefit.'" 62 Fed. Reg. 45,256-02, § II (Aug. 26, 1997). Therefore, federal law mandates that states administering Medicaid must implement the five-year bar for Medicaid programs, and qualified aliens— including those with LPR status—must be present in the country with that status for five years before they can be eligible for Medicaid benefits.[17]

However, the Medicaid Act contains an exception that authorizes the provision of limited Medicaid benefits to aliens, including qualified aliens subject to the five-year bar, for an "emergency medical condition." 8 U.S.C. § 1611(b)(1)(A) (citing 42 U.S.C. § 1396b(v)(3)).

Under this exception, an emergency medical condition is defined as follows:

[T]he term "emergency medical condition" means a medical condition . . . manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—

(A) placing the patient's health in serious jeopardy,

(B) serious impairment to bodily functions, or

(C) serious dysfunction of any bodily organ or part.

---

[17] Certain categories of aliens—refugees, asylees, and aliens who are veterans or on active military duty—of which Ms. Odi was not a member, are exempt from the five-year bar. *See* 8 U.S.C. § 1613(b).

42 U.S.C. § 1396b(v)(3); *see also* 42 C.F.R. § 440.255 (same); 55 Pa. Code § 150.2 (same). The

Commonwealth of Pennsylvania has promulgated regulations clarifying noncitizens' eligibility

for Medical Assistance. As explained therein:

> The emergency medical services required to treat an emergency medical condition
> are only funded by [Medical Assistance] until the medical condition is no longer an
> emergency. [Medical Assistance] funded medical services are not available for
> treatment received after the emergency ends.

55 Pa. Code § 150.11(e). This provision of the Pennsylvania Code is specifically cited in the

Medical Assistance Eligibility Handbook used by DHS personnel to determine whether and

when an applicant is entitled to emergency Medical Assistance. (MAH § 322.34.)

The Commonwealth Court of Pennsylvania has considered what constitutes an

emergency medical condition and determined that "the key to whether an emergency medical

condition existed [is] the term 'acute.'" *Spring Creek*, 45 A.3d at 479 (citing *Greenery Rehab.*

*Group, Inc. v. Hammon*, 150 F.3d 226, 232 (2d Cir. 1998)); *see also Scottsdale Healthcare, Inc.*

*v. Arizona Health Care Cost Containment Admin.*, 75 P.3d 91, 97 (Ariz. 2003). The Court in

*Spring Creek* further explained:

> After considering . . . the plain language of Section 150.11 of the [DPW] regulations
> and Section 1396b(v) of the [Medicaid Act], and the existing case law interpreting
> Section 1396b(v), we, like the other courts that have addressed this issue, believe
> we must focus on the term "acute." The plain language of Section 1396b(v), which
> Section 150.11 mirrors, requires an emergency medical condition to manifest itself
> through *acute* symptoms, which is defined as "characterized by sharpness or
> severity . . . having a sudden onset, sharp rise, and *short course* . . . [*as*] *opposed to
> chronic*,'" *Greenery*, 150 F.3d at 233 (quoting Webster's Third New International
> Dictionary at 23) (emphasis added), and those symptoms must "be short-lived,"
> *Scottsdale*, 75 P.3d at 97.

*Spring Creek*, 45 A.3d at 482; *see also Scottsdale,* 75 P.3d at 97 ("[A] medical condition

manifesting itself by chronic symptoms is not an emergency medical condition, even though the

absence of medical care might lead to one of the three adverse consequences listed in the

statute.").

Among the cases that the Commonwealth Court cited was *Diaz v. Division of Social Services,* 628 S.E. 2d 1 (N.C. 2006). In *Diaz*, the Supreme Court of North Carolina held that an alien's chemotherapy treatment for acute lymphocytic leukemia was not treatment for an emergency medical condition. *Id.* at 2. The patient in *Diaz* initially "presented with severe symptoms, namely sore throat, nausea and vomiting, bleeding gums, and lethargy," and the state Medicaid agency approved payment under the emergency medical condition exception for treatment of the patient's acute symptoms. *Id.* at 2, 5. However, the agency denied Medicaid coverage for the chemotherapy treatments the patient received intermittently for approximately 21 months, ruling that those treatments were non-emergency services. *Id.* at 2. Reviewing the propriety of the agency's decision, the court construed the emergency medical condition, reasoning:

> During petitioner's chemotherapy treatments, his condition was stable and, therefore, he was no longer entitled to Medicaid coverage. As testified to by a medical doctor under contract to review cases for the Medicaid program, if petitioner had not received chemotherapy treatments, he would have eventually regressed into a state of an emergency medical condition. However, as also testified to by that same physician, at the time the chemotherapy treatments at issue were provided to petitioner, he did not meet the requirement of having an emergency medical condition.

*Id.* at 5; *see also Cruz v. Mo. Dep't of Soc. Servs.*, 386 S.W. 3d 899, 906 (Mo. Ct. App. 2012 (affirming agency determination that qualified alien claimant who was subject to the five-year bar and had end-stage renal disease did not have emergency medical condition entitling her to Medicaid for dialysis treatments); *Yale-New Haven Hosp. v. State Dep't of Soc. Servs.*, No. 990495548S, 2000 WL 1268995, at \*3 (Conn. Super. Ct. July 31, 2000) (concluding that claimant "was not entitled to governmental support for the treatment for leukemia, even if his life was at risk" (citing *Greenery*, 150 F.3d at 232)); *Quiceno v. Dep't of Soc. Servs.*, 728 A.2d 553, 555 (Conn. Super. Ct. 1999) (affirming denial of emergency medical assistance for dialysis and

24

noting that "[t]he fatal consequences of the discontinuance of such ongoing care does not transform into emergency medical condition care").

Applying the statutory provisions and interpretive case law to the facts in this case, there is no basis upon which a factfinder could conclude that DHS wrongfully denied Ms. Odi benefits to which she was entitled. It is undisputed that when Ms. Odi sought Medical Assistance for her pancreatitis in 2009, she was not a qualified alien, as she did not have LPR status at that time. However, because her pancreatitis qualified as an "emergency medical condition," DHS approved her application and Medicaid covered all of the charges for her treatment for that condition.

In 2011, when Ms. Odi was initially diagnosed with breast cancer, she had LPR status and was a qualified alien as defined in the Medicaid Act. *See* 8 U.S.C. § 1641(b)(1). However, because she had not had LPR status for five years, she was indisputably subject to the Medicaid Act's mandatory five-year bar. 8 U.S.C. § 1613(a). Her eligibility for Medicaid was thus limited to treatment for an emergency medical condition. *See* 8 U.S.C. § 1611(b)(1)(A) (citing 42 U.S.C. § 1396b(v)(3)); *see also* 42 C.F.R. § 440.255; 55 Pa. Code § 150.2. It is undisputed that DHS determined that Ms. Odi's status at that time satisfied the emergency medical condition exception, and that she received emergency Medicaid benefits for approximately 12 months, including for her mastectomy, radiation, and chemotherapy treatment.

When Ms. Odi's emergency benefits expired in approximately May or June 2012, and she again applied for benefits, she remained subject to the five-year bar and ineligible for Medicaid for non-emergency treatment. DHS denied this application because Ms. Odi was a "permanent alien under the [five-year bar]," and the medical documentation provided in connection with her application "[did] not support the emergency nature of her medical condition

25

and meet the criteria in MAH 322.34."[18] (eCIS Narrative 8/20/2012, DHS DEFS 0291.) Based on the information provided to DHS in connection with Ms. Odi's 2012 application and appeal, the determination that she did not have a qualifying "emergency medical condition" at that time was consistent with applicable law. *See Spring Creek*, 45 A.3d at 482; *see also Greenery*, 150 F.3d at 233; *Diaz*, 628 S.E. 2d at 5.

Specifically, the August 28, 2012 letter provided by Dr. Jenab-Wolcott did not indicate that Ms. Odi was experiencing "acute" symptoms, "characterized by sharpness or severity ... having a sudden onset, sharp rise, and *short course . . . as opposed to chronic*." *Spring Creek*, 45 A.3d at 482 (citation and internal quotation marks omitted) (emphasis in original). Significantly, Dr. Jenab-Wolcott stated that Ms. Odi was "undergoing adjuvant chest wall radiation" that was due to end the following month, that she was taking medication and "tolerating it relatively well with mild hot flashes and minimal joint pain," and that she would need follow-up mammograms and "[five] years of hormonal therapy." (Jenab-Wolcott Ltr.) Moreover, a Clinical Visit Summary, dated August 30, 2012, from one of Ms. Odi's medical providers listing the medical conditions that Ms. Odi was experiencing at that time, including breast cancer, did not indicate that any of the conditions were of an acute or emergent nature. (Clinicial Visit Summary, Defs.' SJ Ex. K, ECF No. 41-11.) Although Ms. Odi did not qualify in 2012 for federal Medicaid benefits under the emergency medical condition exception, DHS approved her for state-funded Medical Assistance, retroactive to August 2012. Moreover, the record establishes that neither Ms. Odi nor Plaintiff had to pay for any medical care rendered to Ms. Odi between 2012 and the

---

[18] The fact that the DHS computer-generated Notice to Ms. Odi regarding this denial contained errors regarding her LPR status and the statutory basis for the denial has no bearing on the viability of Plaintiff's claims. Regardless of the clerical errors in the Notice, Ms. Odi was, in fact, subject to the five-year bar because she had not had LPR status for five years.

date of her death. As noted in the factual background above, it is unclear whether or to what extent Ms. Odi sought or received medical care covered by Medicaid during the period between the expiration of her initial emergency Medical Assistance benefits for breast cancer and the April 2013 retroactive approval of limited state-funded Medical Assistance benefits. However, this ambiguity is not material because, even assuming that Ms. Odi did not receive Medicaid-covered treatment during that period, there is no evidence in the record that she was then suffering from an "emergency medical condition" as that term is defined and interpreted under applicable law. Her condition during that period was "chronic" not "acute."

Finally, there is no evidence that DHS violated the applicable statutes or regulations when, in September 2013, it denied the renewal of Ms. Odi's state-funded Medical Assistance after it expired. Rather, the record reflects that neither Ms. Odi—who was in Nigeria at the time—nor Plaintiff submitted the required application or medical documentation to DHS either before her previous year's benefits expired, or after DHS issued its denial notice.

In short, there is no evidentiary basis on which a reasonable jury could find that DHS wrongfully denied Ms. Odi Medicaid benefits to which she was entitled.

## C. Alleged Equal Protection and Due Process Violations

Based on the evidentiary record, and for reasons similar to those discussed above, Plaintiff cannot sustain his claim that Ms. Odi was denied equal protection and procedural due process.

### 1. Equal Protection

The Equal Protection Clause of the United States Constitution provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. This clause serves to ensure that all similarly situated individuals are treated

27

the same. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). To establish an equal protection claim under Section 1983, a plaintiff must prove that: (1) they are a member of a protected class; and (2) that they received treatment different than that received by other similarly situated individuals. *Keenan v. City of Phila.*, 983 F.2d 459, 465 (3d Cir. 1992). Discriminatory intent is an element of the constitutional violation, and the plaintiff must establish that defendants acted with specific intent to disadvantage members of a class that includes the plaintiff. *See, e.g., Doe ex rel. Doe v. Lower Merion Sch. Dist.*, 665 F.3d 524, 548 (3d Cir. 2011); *Antonelli v. New Jersey*, 419 F.3d 267, 274 (3d Cir. 2005).

Plaintiff claims that Defendants had a "policy and practice of using spurious, false and/or pretextual rationales" to deny Ms. Odi Medicaid benefits based on her "race, ethnicity, color and/or national origin." (Pl.'s Opp. 13.) The record is devoid of any facts to support this assertion.[19] As detailed above, DHS knew of Ms. Odi's ethnicity, national origin, and immigration status—which were included in her DHS file and her 2009 and 2011 Applications—and yet it approved her for federal emergency Medical Assistance in 2009 and 2011, and for state-funded Medicaid in 2012. Based on the factual background and statutory framework detailed above, it is beyond dispute that DHS was *prohibited* by federal law from providing Ms. Odi federal Medicaid benefits other than for an emergency medical condition until she became a qualified alien. *See* 8 U.S.C.§§ 1611(a), (b)(1)(A). Federal law also *mandated* that DHS apply the five-year bar to Ms. Odi even after she became a qualified alien with LPR status, because she had not had that status for five years. *See* 8 U.S.C. § 1613(a).

---

[19] We note that, despite this argument in Plaintiff's summary judgment submission, there is no evidence in the record to support a claim that DHS or Defendants employed an official policy or custom to deprive Ms. Odi or similarly-situated individuals of any Medical Assistance benefits to which they were entitled. *See Monell v. Dep't of Social Services*, 436 U.S. 658, 694 (1978). Moreover, the SAC does not allege a *Monell* claim.

28

The fact that Ms. Odi's eligibility for Medical Assistance was adversely affected by her immigration status does not constitute a violation of equal protection. To the contrary, the Medicaid Act's classification of applicants based on alienage does not render the statute unconstitutional either on its face or as applied to Ms. Odi. As the Second Circuit has explained, "every court of appeals to consider [the PRWORA's] deprivation of other government benefits to unqualified aliens has found the denial to survive rational basis scrutiny." *Lewis v. Thompson*, 252 F.3d 567, 583 (2d Cir. 2001); *see also Mathews v. Diaz*, 426 U.S. 67, 78 (1976) ("[A] host of constitutional and statutory provisions rest on the premise that a legitimate distinction between citizens and aliens may justify attributes and benefits for one class not accorded to the other."). Based on the summary judgment record, there is simply no evidence—documentary or testimonial—that any DHS personnel, let alone any of the named Defendants, considered Ms. Odi's race, ethnicity, national origin, or alienage, for any purpose other than as required to conform to applicable law. Moreover, Plaintiff has not identified any evidence that she was treated differently than other similarly-situated individuals—i.e., other unqualified aliens or qualified aliens subject to the five-year bar—based on her membership in any protected class. *See Keenan v. City of Phila.*, 983 F.2d 459, 465 (3d Cir. 1992).

## 2. *Procedural Due Process*

Plaintiff's procedural due process claim also fails. The Fourteenth Amendment prevents the government from depriving an individual of liberty or property interests without due process of law. U.S. CONST. amend. XIV, § 1. A plaintiff asserting a procedural due process claim must demonstrate that: (1) they were deprived of a liberty or property interest; and (2) the procedures afforded the plaintiff incident to that deprivation failed to comport with the requirements of due process. *Hill v. Borough of Kutztown*, 455 F.3d 225, 233-34 (3d Cir. 2006). A protected

29

property interest exists only if the individual has a legitimate claim of entitlement to the interest. *Hill*, 455 F.3d at 234.

As we have recognized, individuals maintain a property interest in Medicaid benefits to which they are entitled. *Odi II*, 2018 WL 1071928, at \*6. We also noted in *Odi I* that "'[d]ue process requires that a deprivation of a property interest 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *Odi I*, 2017 WL 914818, at \*7 (quoting *Gikas v. Washington Sch. Dist.*, 328 F.3d 731, 738 (3d Cir. 2003); *see also Graham v. City of Phila.*, 402 F.3d 139, 145 (3d Cir. 2005) ("The Supreme Court consistently has held that some kind of hearing is required at some time before a person is finally deprived of his property interests." (citation and internal quotation marks omitted)). The Third Circuit has also recognized "that recipients of welfare benefits have a protected property interest under the federal Due Process Clause, and, when facing termination of their benefits, they must be given notice and an opportunity to respond." *DiGiacomo v. Singleston*, 402 F. App'x 679, 680 (3d Cir. 2010) (citing *Goldberg v. Kelly*, 397 U.S. 254, 261-62, 267-68 (U.S. 1970)) (internal citations omitted).

However, in this case, there is no evidence that Ms. Odi was deprived of due process by DHS. First, because Ms. Odi's entitlement to Medicaid was statutorily limited due to her immigration status and/or the five-year bar, Plaintiff cannot demonstrate that, at any time, Ms. Odi was entitled to Medical Assistance benefits other than those she indisputably received. Specifically, DHS approved Ms. Odi for emergency medical condition benefits for pancreatitis in 2009, covering more than $230,000 in charges for her care for that condition. In 2011, DHS again approved Ms. Odi for emergency medical condition benefits for her breast cancer treatment, which covered her mastectomy and follow-up radiation and chemotherapy for approximately one year. When Ms. Odi's benefits were not renewed in 2012, the uncontroverted

evidence reflects that this determination was consistent with the regulations providing that "the emergency medical services required to treat an emergency medical condition are only funded by [Medical Assistance] until the medical condition is no longer an emergency." 55 Pa. Code § 150.11(e). Moreover, when Ms. Odi, or Plaintiff on her behalf, sought—belatedly—to reapply for Medicaid for her continuing breast cancer treatment, the medical documentation that she supplied did not reflect that she was then suffering from an emergency medical condition as that term is defined in the applicable statutes, regulations, and interpretive case law.

Second, the uncontroverted evidence establishes that when DHS terminated Ms. Odi's emergency Medicaid benefits in 2012, she and Plaintiff received notice and an opportunity to respond and did, in fact, appeal the denial determination. To the extent that Plaintiff claims Ms. Odi was denied procedural due process due to the clerical errors in the August 21, 2012 denial notice, or because Supervisor Sanders did not contemporaneously respond to the October 2012 request for a pre-hearing conference, there is no evidence that those errors were the product of anything other than inadvertent oversight or, perhaps, negligence. It is well established that "the Due Process Clause is simply not implicated by a *negligent* act of an official causing unintended loss of or injury to life, liberty, or property." *Daniels v. Williams*, 474 U.S. 327, 328 (1986) (emphasis in original); *see also DiGiacomo v. Singleton*, No. 08-0383, 2010 WL 11595153, at *2 (E.D. Pa. June 28, 2010) (granting summary judgment where there was "no evidence in the record that the DPW employees' alleged failure to provide advance notice or hearing before terminating his welfare benefits was anything more than mere negligence or error), *aff'd,* 402 F. App'x 679 (3d Cir. 2010).[20]

_____

[20] Moreover, as discussed in Section III.A. above, there is no evidence that any of the named Defendants in this case had any knowledge of or involvement in the handling of Ms. Odi's 2012 Application and appeal, or any alleged misconduct or negligence associated therewith.

Third, it is undisputed that, in connection with their 2012 appeal, Plaintiff and Ms. Odi were provided a pre-hearing conference on April 23, 2013, at which DHS retroactively approved Ms. Odi for benefits in a state-funded category (as she remained ineligible for federal Medicaid benefits). Undisputed evidence also reflects that DHS paid for cancer-related care Ms. Odi received from various providers after the April 2013 conference and withdrawal of her appeal.

Finally, there is no evidence that DHS denied Ms. Odi procedural due process when it terminated her benefits in September 2013, when she was in Nigeria. The undisputed evidence reflects that Plaintiff was provided notice of that termination, and that neither Plaintiff nor Ms. Odi submitted the application or medical documentation necessary for DHS to consider renewal of Ms. Odi's benefits. The undisputed evidence also reflects that Plaintiff was notified of and exercised his appeal rights regarding the 2013 termination, and that he ultimately entered into a Settlement Agreement with DHS in which he agreed that no unpaid medical bills existed for the time period at issue in the appeal.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment must be granted. An appropriate order accompanies this Memorandum.

**BY THE COURT:**

**R. BARCLAY SURRICK, J.**

32